**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

September 2014 Term

_____

No. 14-0379

_____

**FILED**

**October 30, 2014**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN THE MATTER OF:
**JAYMIE GODWIN WILFONG,**
Judge, 20th Judicial Circuit

_____

**DISCIPLINARY PROCEEDING**

**SUSPENSION WITHOUT PAY
AND OTHER SANCTIONS**

_____

Submitted: October 21, 2014
Filed: October 30, 2014

Rachael L. Fletcher Cipoletti, Esq.          David A. Sims, Esq.
David A. Jividen, Esq.                        Law Offices of David A. Sims, PLLC
Office of Disciplinary Counsel                Vienna, West Virginia
Charleston, West Virginia                     Harry G. Deitzler, Esq.
Special Judicial Disciplinary Counsel         Hill, Peterson, Carper,
                                              Bee & Deitzler, PLLC
                                              Charleston, West Virginia
                                              Counsel for Judge Wilfong

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**JUSTICE LOUGHRY concurs, in part, and dissents, in part, and reserves the right
to file a separate opinion.**

SYLLABUS BY THE COURT

1.    "The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings."  Syllabus Point 1, *W.Va. Judicial Inquiry Commission v. Dostert*, 165 W. Va. 233, 271 S.E.2d 427 (1980).

2.    "Under [Rule 4.5 of the *West Virginia Rules of Disciplinary Procedure*], the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.'"  Syllabus Point 4, *In re Pauley*, 173 W.Va. 228, 314 S.E.2d 391 (1983).

3.    "In a disciplinary proceeding against a judge, in which the burden of proof is by clear and convincing evidence, where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated."  Syllabus Point 4, *Matter of Starcher*, 202 W.Va. 55, 501 S.E.2d 772 (1998).

4.    "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice."  Syllabus, *In the Matter of Gorby*, 176 W.Va. 16, 339 S.E.2d 702 (1985).

5.    "Under Rule 4.12 of the *Rules of Judicial Disciplinary Procedure* [1998] the Judicial Hearing Board may recommend, or this Court may impose, one or more of the following sanctions for each violation by a justice, judge, or magistrate of the

i

*Code of Judicial Conduct*: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement in limited circumstances. Additionally, this Court can assess the cost of the disciplinary proceedings against a justice, judge, or magistrate." Syllabus Point 6, *In re Watkins*, 233 W.Va. 170, 757 S.E.2d 594 (2013).

6. "Pursuant to Article VIII, Sections 3 and 8 of the West Virginia Constitution and Rule 4.12 of the Rules of Judicial Disciplinary Procedure, it is clearly within this Court's power and discretion to impose multiple sanctions against any justice, judge or magistrate for separate and distinct violations of the Code of Judicial Conduct and to order that such sanctions be imposed consecutively." Syllabus Point 5, *In re Toler*, 218 W.Va. 653, 625 S.E.2d 731 (2005).

7. "This Court has the inherent power to inquire into the conduct of justices, judges and magistrates, and to impose any disciplinary measures short of impeachment that it deems necessary to preserve and enhance public confidence in the judiciary." Syllabus Point 8, *In re Watkins*, 233 W.Va. 170, 757 S.E.2d 594 (2013).

8. "Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's

ii

public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist." Syllabus Point 3, *In re Cruickshanks*, 220 W.Va. 513, 648 S.E.2d 19 (2007).

**Justice Ketchum:**

In this judicial disciplinary proceeding, a circuit court judge admits that she had an affair with a local man for over two years, and concealed the relationship from her husband and the man's wife. The judge deliberately intertwined the affair with her judicial office, and eventually involved her staff, courthouse employees, the prosecuting attorney's office, and local lawyers in concealing the affair. Further, the circuit court judge's paramour and his subordinates routinely appeared in criminal cases on the prosecuting attorney's behalf in her courtroom. The judge never revealed her relationship to any defendant or any other litigant even though she knew she was ethically bound to do so. She only admitted to the relationship when she learned that other lawyers were contemplating filing complaints against her with the Judicial Investigation Commission.

Eventually, the circuit court judge stipulated to some of the facts relevant to the affair. The circuit court judge also agreed not to contest some of the disciplinary charges against her because, as the Judicial Hearing Board found, "it was not credible to do so."

The evidence before the Hearing Board established a clearly articulable nexus between the judge's extrajudicial misconduct and her judicial duties. The Hearing Board determined that the circuit court judge's conduct constituted eleven separate violations of seven Canons of the Code of Judicial Conduct, and recommended she be severely sanctioned. The circuit court judge now appeals, arguing that there is

1

insufficient proof to support five of the eleven violations, and arguing that the recommended sanctions are too severe.

As set forth below, this Court adopts the Hearing Board's finding that the judge committed eleven violations of seven Canons. The judge demeaned her office, and significantly impaired public confidence in her personal integrity and in the integrity of her judicial office. As a sanction, we hold that the judge must be censured; suspended until the end of her term in December 2016; and required to pay the costs of investigating and prosecuting these proceedings.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Jaymie Godwin Wilfong is a circuit court judge in Randolph County (which is formally titled the Twentieth Judicial Circuit). She was elected as a circuit judge in 2008, and her present term ends on December 31, 2016. Judge Wilfong is the only circuit court judge in the county.[1]

## A. The Affair

This disciplinary matter involves five separate complaints filed against Judge Wilfong with the Judicial Investigation Commission. All five complaints center upon an extramarital affair that she had with William Travis Carter. The romantic and

---

[1] Judge Wilfong previously served as a family court judge, from 2003 until 2008.

sexual relationship began between August and October 2011 and continued until October 2013.[2] Judge Wilfong also sent sexually explicit e-mails, texts, instant messages, and nude photos of herself to Mr. Carter. Both Judge Wilfong and Mr. Carter were married to other individuals.

Judge Wilfong stipulated to most of the general factual allegations that follow before the Judicial Hearing Board that reviewed the five complaints.

Throughout the extramarital affair, Mr. Carter was the director of the board of the North Central Community Corrections program ("NCCC"). NCCC was, in part, established and supervised by the Randolph County Commission. By law, Judge Wilfong served as a non-voting member of the NCCC board.[3] She regularly attended NCCC board meetings, and participated in establishing operating budgets for Mr. Carter's office and Mr. Carter's salary. During the affair, Judge Wilfong also persuaded the county commission to supply Mr. Carter with a four-wheel-drive vehicle.

The NCCC program supervises criminal defendants who have been released from incarceration (both before and after conviction), and assists in their monitoring and transition into the community. Defendants must pay a fee to the NCCC

_____

[2] The parties also stipulated that Judge Wilfong's close personal relationship with Mr. Carter began in 2010, when Mr. Carter approached her for advice about his marriage.

[3] *See* W.Va. Code § 62-11C-6 [2013] (requiring any community-based correction service to be supervised by a community criminal justice board composed of various county officials, including a "circuit judge from the county or counties represented").

board to participate in the program.[4]  Approximately 40% of the defendants who are indicted on a felony charge in Randolph County, and who are given pretrial bond release, are ordered by the circuit court judge to use the NCCC program.

The parties established that, from October 2011 until October 2013, Mr. Carter and/or his subordinate staff[5] from the NCCC noted an appearance before Judge Wilfong in her courtroom in at least 46 criminal matters.[6]  Mr. Carter or the subordinate staff member appeared in the courtroom ready to offer testimony to Judge Wilfong to evaluate whether a criminal defendant was a candidate for alternative sentencing at NCCC, or to evaluate whether a participating defendant violated the terms of placement at NCCC.  There were at least two occasions when members of Mr. Carter's NCCC staff gave sworn testimony about criminal defendants before Judge Wilfong.

Judge Wilfong never disclosed her intimate relationship with Mr. Carter, and therefore her inherent conflict of interest, on the record to any of the parties in the above-referenced criminal matters.  The record establishes that she knew of the inherent conflict.  For instance, in July 2013, Mr. Carter was scheduled to testify in a probation

---

[4] A defendant must pay $25.00 per month to participate if on pretrial bond, or $100.00 per month post-conviction.  The defendant pays another $10.00 for each urinalysis that is given.  Urinalysis is done at least once a week, and at the discretion of NCCC staff multiple times per week.

[5] The phrase "subordinate staff" is a generous term.  Between 2011 and 2013, NCCC had between two and three employees: Mr. Carter, an administrative assistant, and at times a third employee.

[6] NCCC staff members often came to court ready to offer statements or testimony, but their official "appearance" was not noted by the court reporter.

4

revocation proceeding before Judge Wilfong. Knowing it would be improper for her to hear Mr. Carter's testimony, and not wanting to disclose her secret affair, Judge Wilfong sent a text message to Mr. Carter. She told Mr. Carter to call the prosecuting attorney (because she could not do so) and, without stating why, ask for permission to have a subordinate testify in his place. Subsequently, Mr. Carter's subordinate testified in the case.

Judge Wilfong did disclose the relationship to her long-time judicial secretary, to her law clerk, and to a probation officer, all of whom were court employees. By doing so, she placed her court staff in the position of having to be deceptive and explain away her relationship with Mr. Carter. Judge Wilfong now concedes that she violated her responsibilities as their immediate supervisor.

The parties agree that Judge Wilfong used her judicial chambers during the course of the business day to carry on her affair with Mr. Carter. She conceded that she performed sexual acts with Mr. Carter in her judicial chambers. Court personnel witnessed Mr. Carter entering and exiting Judge Wilfong's chambers from a non-public entrance. At times when the two were alone in chambers, court personnel would find it necessary to knock on the door and interrupt Judge Wilfong's activities in order to insist that she continue with the daily court proceedings.

By Judge Wilfong's actions, courthouse personnel were placed in the uncomfortable position of having to keep Judge Wilfong's secret and explain away the circumstances surrounding the appearance of Judge Wilfong's relationship with Mr. Carter.

5

Judge Wilfong also enlisted two local lawyers to further her sexual and romantic contact with Mr. Carter. Judge Wilfong repeatedly requested the use of and utilized the personal residence of the first lawyer, Lori A. Haynes, to secretly meet with Mr. Carter. At the same time, Ms. Haynes routinely appeared in Judge Wilfong's courtroom, usually representing criminal defendants in felony matters. In some of those cases, Mr. Carter and his staff were called upon to offer opinions about a defendant's placement (or revocation of placement) in NCCC. Further confusing matters, while the affair was ongoing, Ms. Haynes began working as an assistant prosecutor in the office of the Randolph County Prosecuting Attorney, where she continued to use NCCC's services in sentencing criminal defendants. Judge Wilfong not only never disclosed her intimate relationship with Mr. Carter, she also never disclosed to any defendants, litigants, or other attorneys (including the prosecuting attorney) that she used Ms. Haynes to further and conceal that relationship.

The second lawyer, Phillip S. Isner, testified that Judge Wilfong asked for and received Mr. Isner's garage door opener so she could surreptitiously meet Mr. Carter. In the same time period, Mr. Isner appeared in Judge Wilfong's courtroom and represented criminal defendants in several felony matters where Mr. Carter and his staff were called upon to offer opinions. To repeat, Judge Wilfong never disclosed her secret arrangement with Mr. Isner to any of the other lawyers or litigants in her courtroom, including the prosecuting attorney.

It now appears that, between October 2011 and October 2013, Judge Wilfong was repeatedly made aware that her actions raised ethical problems. For

6

instance, Mr. Isner – the lawyer who loaned her his garage door opener – testified he privately advised Judge Wilfong that she needed to publicly disclose her relationship with Mr. Carter because of the potential ethical issues presented. In January 2012, the judge's law clerk learned of the relationship and apparently recognized the ethical issues, but Judge Wilfong then lied and told the law clerk the relationship had ended. The Supreme Court Administrator heard rumors of the relationship and, on April 11, 2013, contacted Judge Wilfong to discuss the ethical implications on her judicial office. Lawyer Stephen G. Jory, a former U.S. Attorney and former chairman of the Lawyer Disciplinary Board, also discussed hearing rumors of the relationship with Judge Wilfong in April 2013. Judge Wilfong subsequently represented to the Supreme Court Administrator and to Mr. Jory that the relationship had ended.

## B. The Filing of Complaints

In October of 2013, Chief Counsel for the Judicial Investigation Commission learned of rumors that Judge Wilfong was having an affair with the director of NCCC. Chief Counsel informed the Judicial Investigation Commission of the rumors, but was told she could not file a formal complaint against Judge Wilfong because she did not have personal knowledge of Judge Wilfong's ethical improprieties. On October 10, 2013, Chief Counsel contacted Judge Wilfong's office but, because the judge was out of the office at a conference, left a message.

That same day, Judge Wilfong contacted Mr. Jory seeking Chief Counsel's cell phone number. Mr. Jory told the judge that there were lawyers in Randolph County

7

who said they felt obligated to file an ethics complaint against her because of her affair. Mr. Jory said he thought it would be better if Judge Wilfong self-reported her actions. She asked Mr. Jory to let lawyers know that she was going to self-report immediately. The following morning, October 11, 2013, Judge Wilfong advised Chief Counsel that she intended to self-report her actions to the Judicial Investigation Commission.

In a letter dated October 14, 2013, Judge Wilfong filed a self-reporting complaint with the Judicial Investigation Commission saying that she had been involved in a romantic and sexual relationship with Mr. Carter for the previous "twenty-six months," but that the relationship had ended. Testimony from Mr. Carter later indicated that the relationship ended the same day Judge Wilfong received the phone call from Chief Counsel for the Judicial Investigation Commission.

The day after the judge's self-reporting complaint, on October 15, 2013, the judge's law clerk filed a complaint with the Commission reporting that Judge Wilfong had confided in January 2012 that she had an "inappropriate" relationship with Mr. Carter, but said that the relationship had ended. The law clerk later discovered the relationship had continued beyond January 2012. Because the relationship potentially implicated pending criminal proceedings, the law clerk believed she was obligated to file a complaint.

The following day, a third complaint was filed by the Prosecuting Attorney for Randolph County. The prosecutor believed Judge Wilfong had a romantic relationship with Mr. Carter that created a potential conflict regarding sentencing offenders to the NCCC program. The prosecutor also stated that the relationship created

8

a potential conflict when Mr. Carter testified in hearings before Judge Wilfong. Finally, the prosecutor stated that the revelation of the inappropriate relationship had created problems with respect to the public's perception of the integrity of the judicial process.

A fourth complaint was filed on October 21, 2013, by a local lawyer. The lawyer had served as defense counsel in two criminal matters where Mr. Carter was a primary witness in hearings conducted before Judge Wilfong, The lawyer testified that he was prompted to file the complaint because his two clients were upset after learning of the affair in local newspapers. Since filing the complaint, the lawyer testified that when he has appeared before Judge Wilfong, he felt discomfort when she mentioned his filing against her at the commencement of proceedings to discern whether he wanted her disqualified. The lawyer has filed two motions to disqualify the judge, only one of which she granted (and the other of which was granted by this Court). The lawyer testified that the relentless press attention to the controversy has caused a loss of trust in the legal system. Further, he testified he feels perceived as a "judicial rat" for filing a complaint with the Judicial Investigation Commission.

The fifth and final complaint against Judge Wilfong was filed by four lawyers who were members of the board of the NCCC program. They indicated they did not have first-hand knowledge of the relationship between Judge Wilfong and Mr. Carter, but that they perceived the relationship created conflicts of interest.

9

## C. The Ethical Charges and Costs

Because the Chief Counsel for the Judicial Investigation Commission was a potential witness, special counsel (Rachel L. Fletcher Cipoletti) had to be appointed to investigate and prosecute the five complaints for the Commission. As part of her investigation, special counsel sought records and information from the Randolph County Commission. To investigate the complaints against Judge Wilfong, the Randolph County Commission spent approximately $50,000.[7]

After investigating the five complaints, the Judicial Investigation Commission filed a formal statement of charges on April 23, 2014, charging Judge Wilfong with violating eight different Canons of the Code of Judicial Conduct.[8]

On May 1, 2014, the Prosecuting Attorney of Randolph County filed a petition to disqualify Judge Wilfong from presiding over all cases handled by the prosecuting attorney's office, and requested the appointment of a special judge. These cases – which Judge Wilfong estimated are 80% of her caseload – include criminal, juvenile, and abuse and neglect cases. Pursuant to Rule 17.01 of the *Trial Court Rules*, Judge Wilfong forwarded the petition to the Chief Justice of this Court. Judge Wilfong noted, however, that she believed the petition should be denied, largely because she had

---

[7] When asked about the cost of the "investigation of the situation between Mr. Carter and Judge Wilfong," a county commissioner stated that, "Between the attorney fees, the forensic examination that we had conducted on Mr. Carter's cellphones and computers, the private investigator that he used; the County has close to $50,000 of expenses tied up in that."

[8] We discuss these Canons later in our Opinion.

10

presided over cases involving the prosecuting attorney for the previous seven months without any objection by the prosecuting attorney.

The Chief Justice, however, perceived a substantial likelihood that Judge Wilfong's impartiality could reasonably be questioned. Hence, the Chief Justice granted the prosecuting attorney's petition and disqualified Judge Wilfong from presiding in any case involving the prosecuting attorney's office. The Chief Justice then appointed senior status judges to hear all cases involving the prosecutor's office.

In the days following, several other local lawyers filed petitions to disqualify Judge Wilfong from their pending cases. These local lawyers were witnesses against Judge Wilfong before the Judicial Hearing Board. Judge Wilfong granted those additional petitions to disqualify, and senior status judges were appointed to hear those cases as well.

To date, as a result of Judge Wilfong's disqualification, billing records filed with the administrative office show that this Court has expended almost $53,000 on senior status judges doing Judge Wilfong's job. A senior status judge is paid upwards of $435 per day to travel and hold court in Randolph County.

### D. The Hearing Board's Recommended Decision

On August 11, 2014, the case against Judge Wilfong was heard by the Judicial Hearing Board. In a written order dated August 22, 2014, the Hearing Board concluded that Judge Wilfong had either admitted, or that it found by clear and convincing evidence, that she committed eleven separate violations of seven Canons of

the Code of Judicial Conduct. On the eighth Canon, the Hearing Board found insufficient evidence to establish a violation.[9]

Under the Rules of Judicial Disciplinary Procedure, the Hearing Board noted that for each violation it could recommend that this Court impose a maximum penalty of suspension for one year and a fine of up to $5,000, and that it could impose the penalties consecutively. *See* Rule 4.12(4) & (5), *Rules of Judicial Disciplinary Procedure*; Syllabus Point 6, *In re Watkins*, 233 W.Va. 170, 757 S.E.2d 594 (2013); Syllabus Point 5, *In re Toler*, 218 W.Va. 653, 625 S.E.2d 731 (2005). Hence, the Board could have recommended a maximum sanction against Judge Wilfong of an eleven-year suspension without pay plus a fine of $55,000.

The Hearing Board recommends that Judge Wilfong be censured by this Court on each of her eleven violations of the Code of Judicial Conduct; that she be suspended for a total period of three years; that she be fined a total of $20,000; and that she be ordered to pay the costs of the proceeding.

Judge Wilfong objected to the Hearing Board's recommendations. As set forth below, we modify the recommended sanction.

---

[9] The eighth Canon that Judge Wilfong was alleged to have violated was Canon 3B(5), which requires a judge to "diligently discharge the judge's administrative responsibilities without bias or prejudice[.]" The Hearing Panel concluded that the special counsel failed to establish clearly and convincingly that Judge Wilfong exhibited actual bias or prejudice regarding any litigant.

12

## II.
## STANDARD OF REVIEW

In reviewing a recommendation of the Judicial Hearing Board, this Court is required to make an independent evaluation of the Board's findings of fact and recommended sanctions in order to determine whether the allegations have been proven by clear and convincing evidence. Syllabus Point 1, *W.Va. Judicial Inquiry Comm'n v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980); Syllabus Point 4, *In re Pauley*, 173 W.Va. 228, 314 S.E.2d 391 (1983). However, in a disciplinary proceeding against a judge, "where the parties enter into stipulations of fact, the facts so stipulated will be considered to have been proven as if the party bearing the burden of proof has produced clear and convincing evidence to prove the facts so stipulated." Syllabus Point 4, *Matter of Starcher*, 202 W.Va. 55, 501 S.E.2d 772 (1998).

## III.
## ANALYSIS

Several days before her hearing, Judge Wilfong stipulated to many of the facts contained in the Judicial Investigation Commission's formal charge. We therefore accept those stipulated facts as true. Furthermore, Judge Wilfong stipulated shortly before her hearing that she violated three Canons of the Code of Judicial Conduct. Specifically, she agreed that her actions compromised the integrity of the judiciary (Canon 1); that her actions created an appearance of impropriety (Canon 2A); and that she allowed her relationship to influence her judicial conduct and judgment (Canon 2B).

13

At the hearing, both sides presented and cross-examined witnesses on matters pertaining to four other Canons that were not entirely encompassed by the stipulations.

Judge Wilfong testified before the Hearing Board that she is now aware that her conduct created a conflict. She now concedes that it was improper for her to preside over cases in which Mr. Carter or his employees appeared from 2011 through 2013, when she was involved in the intimate relationship.[10] She further acknowledged that she never advised criminal defendants or their counsel of her intimate relationship. Judge Wilfong stipulated that she now believes the integrity of the judicial system was harmed by her actions.

However, until she self-reported her actions to the Judicial Investigation Commission, Judge Wilfong never sought guidance from the Commission about the ethical ramifications of her relationship with Mr. Carter. The record establishes that Judge Wilfong was aware she could seek such guidance on the propriety of her actions. Judge Wilfong stipulated that during the affair she contacted the Commission for ethics advice on three other, unrelated, questions involving her potential disqualification or recusal from cases. Furthermore, from January 1, 2012, until her resignation on April 23, 2014, Judge Wilfong served as a member of the Judicial Hearing Board. The Hearing

---

[10] We note, however, that Judge Wilfong now argues that she was seduced by Mr. Carter, and was so blinded by her relationship that (at the time) she never perceived any conflict in presiding over cases involving Mr. Carter or his subordinates. The Hearing Board rejected this assertion, and so does this Court.

Board is charged with enforcing "the highest standards of judicial conduct." Rule 3, *Rules of Judicial Disciplinary Procedure*.

Still, despite her testimony to the Hearing Board, in her brief to this Court (in a garbled recitation of assertions over nearly nine, single-spaced pages), Judge Wilfong claims that the investigation, prosecution, and development of this case "has been askew [from] the beginning." For instance, Judge Wilfong criticizes the Judicial Investigation Commission's special counsel for sending a private investigator to interview potential witnesses prior to the hearing.

Judge Wilfong also claims, in one part of her brief, that the parties' stipulations of fact establish "that the burden of proof was not met" by the special counsel on violations of the four other Canons alleged in the formal charge. However, at another point of her brief, Judge Wilfong criticizes the special counsel for calling witnesses to testify, and thereby "bias the Judicial Hearing Board" into concluding that the judge violated those same four Canons. In summary, Judge Wilfong dramatizes that she has been subjected to a witch hunt.

As we understand the arguments contained in Judge Wilfong's brief, her overarching assertion is that there is no evidence, let alone clear and convincing evidence, to support the Hearing Board's findings and recommendations. She appears to contend that she has admitted her culpability to violating three Canons, and that the Hearing Panel erred in considering any evidence that she violated the remaining four Canons.

15

Judge Wilfong told the Hearing Board "she deserves to be punished" and that "she was willing to accept the punishment due her[.]" Judge Wilfong said she recognizes that the affair was wrong, and says she has demonstrated remorse and regret.

However, Judge Wilfong now contends that this Court should not punish her in the way that the Hearing Board has recommended. In her brief, she asks this Court to reduce the Hearing Board's recommended discipline to a reprimand; at oral argument, her lawyer asked for no more than a 60-day suspension.

We largely reject Judge Wilfong's arguments. We recognize that Judge Wilfong probably, initially, intended her conduct with Mr. Carter to be nothing more than a private relationship between consenting adults. "Although both were married to other people, we normally would be loath to interfere in such personal matters. In this case, however, the private aspects of the affair are secondary to the public problems it has created." *In re Gerard*, 631 N.W.2d 271, 277 (Iowa 2001). Judge Wilfong carelessly and deliberately intertwined her affair with her judicial office, and in so doing seriously damaged public confidence in the integrity and impartiality of the judiciary.

As set forth below, this Court finds the record clearly and convincingly establishes multiple violations of seven Canons of the Code of Judicial Conduct. As discipline, we alter the Hearing Board's recommended sanctions. We eliminate Judge Wilfong's fine and reduce the length of her suspension from three years to the remainder of her term.

16

## A. The Seven Canons Violated by Judge Wilfong

The Hearing Board concluded that Judge Wilfong committed eleven violations of seven Canons of the Code of Judicial Conduct. Those seven Canons, and the evidence supporting the eleven violations, are as follows:

### 1. Canon 1

Canon 1 of the Code of Judicial Conduct provides:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.

Judge Wilfong stipulated that her conduct in her relationship with Mr. Carter violated Canon 1. The Hearing Board further concluded that clear and convincing evidence was presented establishing its violation. The Board found Judge Wilfong failed to maintain the high standards of conduct expected of a judge when she:

a. Chose to conduct her illicit sexual relationship in her court chambers during court hours;

b. Placed others over whom she had power (such as subordinate employees, courthouse staff, members of the prosecutor's office, and local lawyers) in an untenable position when she disclosed her secret to them and impelled them to conceal the illicit relationship, and/or used them to facilitate the relationship;

c. Lied to others that the relationship had or was ending, but then continued or resumed the relationship; and

17

d. Had actual knowledge of the ethical problems inherent in the relationship, yet failed to disqualify herself in matters where her impartiality might reasonably be questioned.

Judge Wilfong also agreed that her conduct in serving as a member of the board of the NCCC while carrying on her relationship with Mr. Carter, the director of the NCCC, violated Canon 1. Likewise, the Hearing Board concluded that clear and convincing evidence was presented again establishing its violation. The Board found Judge Wilfong failed to maintain the high standards of conduct by:

a. Failing to disclose her relationship to the NCCC board;

b. By serving on the board, discussing budgets and Mr. Carter's salary, and reviewing and approving payment of NCCC bills;

c. By advocating on Mr. Carter's behalf, including encouraging the county commission to purchase a vehicle for Mr. Carter; and

d. By presiding over courtroom matters involving the NCCC in which she exercised discretionary judicial authority.

Canon 1 is premised on the principle that public deference to the rulings of courts depends upon public confidence in the integrity and independence of judges. When a judge fails to establish, maintain, and enforce high standards of conduct, the judge "*diminishes public confidence in the judiciary and thereby does injury to the system of government under law*." Commentary to Canon 1 (emphasis added).

The record is rife with examples showing Judge Wilfong failed to maintain high standards in her conduct as a circuit judge. There is also substantial evidence that

18

she has seriously harmed public confidence in her integrity and independence, and thereby that she has done significant injury to our system of government under law. We therefore find that the record supports the Hearing Board's finding that Judge Wilfong twice violated Canon 1.

### 2. Canon 2A

Canon 2A of the Code of Judicial Conduct provides:

> A judge shall respect and comply with the law, shall avoid impropriety and the appearance of impropriety in all of the judge's activities, and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

First, Judge Wilfong admitted that her conduct as a judge during her relationship with Mr. Carter violated Canon 2A. Second, Judge Wilfong admitted she violated this Canon in her conduct while serving on the NCCC board while Mr. Carter served as its director. The Hearing Board found clear and convincing evidence to support these two violations.

We find clear and convincing evidence in the record supporting these two violations of Canon 2A. Judge Wilfong's actions were improper, appeared improper, and did not promote but undermined public confidence in the integrity and impartiality of the judiciary.

### 3.  Canon 2B

Canon 2B of the Code of Judicial Conduct provides, in part:

> A judge shall not allow family, social, political, or other relationships to influence the judge's judicial conduct or judgment. . . .

19

Judge Wilfong admitted that her relationship with Mr. Carter violated Canon 2B. Further, the Hearing Board concluded there was clear and convincing evidence establishing its violation, because Judge Wilfong permitted her relationship with Mr. Carter to adversely affect the performance of her judicial duties and judgment.

Judge Wilfong also admitted that her illicit relationship violated Canon 2B because it adversely affected her statutory service as a member of the board of the NCCC. The Board similarly found clear and convincing evidence establishing this violation.

We find clear and convincing evidence in the record supporting these two violations of Canon 2B.

### 4. Canon 3C(1)

Canon 3 of the Code of Judicial Conduct dictates that the "judicial duties of a judge take precedence over all the judge's other activities." Canon 3C concerns a judge's administrative duties. Canon 3C(1) provides:

> A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.

The Hearing Board determined that Judge Wilfong violated Canon 3C(1) by allowing her relationship with Mr. Carter to negatively impact her performance of her official duties. Judge Wilfong had sexual and romantic relations with Mr. Carter in her chambers during court hours. Court personnel had to knock on the door and insist that Judge Wilfong continue with the daily court proceedings. Then members of the public

20

and court employees saw Mr. Carter entering and exiting Judge Wilfong's chambers from a non-public entrance. Judge Wilfong confided in her secretary, law clerk, and probation officer the existence of the relationship. And when she was confronted about the relationship by court officers or members of the Bar, she represented that the relationship had or would be ending when, in fact, she was continuing or resuming the relationship. The Hearing Board found these actions placed court employees and members of the Bar in a difficult position with regard to the performance of their official duties, and established that Judge Wilfong breached her responsibility to diligently discharge her administrative duties with professional, cooperative competence.

We find clear and convincing evidence in the record to support the Hearing Board's determination that Judge Wilfong violated Canon 3C(1).

### 5. Canon 3C(2)

Canon 3C(2) of the Code of Judicial Conduct provides:

> A judge shall require staff, court officials, and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties.

The Hearing Board found clear and convincing evidence establishing that Judge Wilfong violated Canon 3C(2). The Board found she involved her secretary, her law clerk, an assistant prosecutor, local attorneys, and others in furthering and concealing her affair with Mr. Carter. She also encouraged these individuals, all of whom were subject to her direction, control or influence, to violate fundamental standards of fidelity and diligence to further her affair.

21

Judge Wilfong asserts, as one witness testified, that her relationship with Mr. Carter was the "worst kept secret in the courthouse." Judge Wilfong points out that, for the two years the relationship was active, no one filed an ethical complaint against her and no one sought to disqualify her from any cases. Further, she points out that in the seven months between the filing of the five complaints in October 2013 and the Judicial Investigation Commission's formal charges in April 2014, only one of the complaining lawyers petitioned to have her disqualified from his cases. Judge Wilfong therefore contends that any suggestion she placed others in a difficult position or failed in her duties is nothing more than special counsel's "witch hunt."

We reject the contorted interpretation of the record that the judge offers in her brief to this Court. The fact that a judge thinks that there was no harm caused by his or her actions is irrelevant, because a "no harm, no foul" rule does not exist in the Code of Judicial Conduct.[11] We also reject her attempt to cast aspersions upon the motivations of special counsel in prosecuting the Judicial Investigation Commission's formal charges. Judge Wilfong's argument fails to recognize one salient fact: she was the only circuit judge in the county. Those lawyers who filed ethical complaints against her did so only with great trepidation and fear of being labeled and treated as a "rat."

Even though Judge Wilfong recognized the ethical impropriety of her actions in her two-year affair, and was repeatedly told by others she should address those

---

[11] *See Lawyer Disciplinary Bd. v. Blevins*, 222 W.Va. 653, 659, 671 S.E.2d 658, 664 (2008) ("There does not exist in the Rules of Professional Conduct a 'no harm, no foul' Rule.").

22

improprieties publicly, she failed to remove herself from cases involving Mr. Carter or NCCC. After the complaints were filed in October 2014, Judge Wilfong should have voluntarily disqualified herself from cases involving the complaining lawyers. Instead, she now asserts there is no basis to think there is any appearance of impropriety simply because the lawyers waited until the Judicial Investigation Commission issued its statement of charges to seek her disqualification. We think, however, that the lawyers did not act until it was clear Judge Wilfong would face disciplinary action. To this Court, the reason is obvious: she was the only circuit judge in the county.[12]

The Code of Judicial Conduct is founded on the principle that a judge is a leader whether she wants to be or not. A judge sets the standard for the administration of justice and for the practice of law in her jurisdiction. "Citizens judge the law by what they see and hear in courts, and by the character and manners of judges and lawyers." *In re Watkins*, 233 W.Va. at 182, 757 S.E.2d at 606. The evidence of record established that Judge Wilfong's conduct set a low standard for the administration of justice.

A judge is held to a higher standard of personal and professional conduct, and an illicit sexual relationship involving a judge is inconsistent with the high standards of conduct required of judges. This is particularly so where the relationship involves a person who appears before the judge, and where the judge engages in sexual relations on

---

[12] Even Mr. Carter, in his testimony before the Hearing Board, recognized the problem of living in a one-judge county. When asked why he didn't talk to anyone about his concerns about his illicit relationship with Judge Wilfong, he said, "I didn't go to anybody because . . . I didn't feel I had anywhere to go with this."

23

courthouse property, during court hours. The Board determined that Judge Wilfong repeatedly misrepresented to others that she understood the ethical ramifications of her relationship with Mr. Carter and, because of those ramifications, that she would terminate the relationship and/or otherwise disclose its existence to avoid the appearance of any conflict of interest.

It is inconsistent with the requirement that a judge diligently discharge his or her administrative duties with fidelity and diligence to place others with whom the judge works, and/or over whom the judge has power, in a compromising situation. Judge Wilfong placed members of her staff, of the probation office, the prosecutor's office, and the local bar in a compromising situation by privately disclosing the existence of her improper relationship while implicitly or expressly requesting they keep the judge's secret.

This evidence clearly and convincingly establishes that Judge Wilfong violated Canon 3C(2).

### 6. Canon 3E(1)

A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, . . .

The Hearing Board concluded that the clear and convincing evidence established that Judge Wilfong violated Canon 3E(1). The Board found that Judge Wilfong should have disqualified herself in any matter involving the NCCC Program while she was involved in a relationship with Mr. Carter. Furthermore, it found the judge should have disqualified herself from any matter involving Ms. Haynes (the private

24

lawyer who later became an assistant prosecutor) after the judge disclosed her relationship with Mr. Carter to Ms. Haynes, and after she used Ms. Haynes's residence to further her relationship, and after she expressly or implicitly expected Ms. Haynes to keep the relationship confidential. For the same reasons, the Board found Judge Wilfong should have disqualified herself from any matter involving Mr. Isner. Finally, the Board concluded that the judge should have removed herself from any matter involving any other attorney or party after she had disclosed her relationship to the other attorney or party, and either expressly or impliedly expected the attorney or party to keep the relationship confidential.

The record clearly and convincingly establishes that Judge Wilfong repeatedly, over a two-year period, participated in proceedings in which she knew that her impartiality might reasonably be questioned and yet failed to disqualify herself. We therefore find it established that Judge Wilfong violated Canon 3E(1).

## 7. Canon 4A

Canon 4A of the Code of Judicial Conduct pertains to a judge's "extra-judicial" activities, and provides:

> A judge shall conduct all of the judge's extra-judicial activities so that they do not:
>
> > (1) cast reasonable doubt on the judge's capacity to act impartially as a judge;
> >
> > (2) demean the judicial office; or
> >
> > (3) interfere with the proper performance of judicial duties

The Hearing Board found two violations of Canon 4A. First, the Hearing Board found clear and convincing evidence establishing that Judge Wilfong's illicit relationship with Mr. Carter cast reasonable doubt on her ability to act impartially as a judge, demeaned her office, and interfered with the proper performance of her judicial duties. Second, the Hearing Board found clear and convincing evidence that Judge Wilfong's illicit relationship interfered with the proper performance of her statutory judicial duties as a member of the NCCC board, thereby casting doubt on her capacity to act impartially as a judge and demeaning her office.

This Court's authority is "confined to those situations for which there is an articulable nexus between the extrajudicial conduct and the judge's duties." *In re Disciplinary Proceedings Against Turco*, 137 Wash.2d 227, 244, 970 P.2d 731, 740 (1999). The record supports the Hearing Board's finding that Judge Wilfong's extrajudicial conduct with Mr. Carter demeaned her office, and reflected adversely on the judiciary and the perception of her ability to decide cases fairly. In other words, special counsel established an articulable nexus between the extrajudicial conduct and the judge's duties. We therefore hold that Judge Wilfong committed these two violations of Canon 4A.

In summary, like the Hearing Board, we find that Judge Wilfong committed eleven different violations of seven Canons of the Code of Judicial Conduct.

26

## B.  The Sanction Against Judge Wilfong

The overriding goal of judicial discipline is to preserve public confidence in the integrity and impartiality of the judiciary.  "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice."  Syllabus, *In the Matter of Gorby*, 176 W.Va. 16, 339 S.E.2d 702 (1985).

"Under Rule 4.12 of the *Rules of Judicial Disciplinary Procedure* [1998] the Judicial Hearing Board may recommend, or this Court may impose, one or more of the following sanctions for each violation by a justice, judge, or magistrate of the *Code of Judicial Conduct*: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement in limited circumstances.  Additionally, this Court can assess the cost of the disciplinary proceedings against a justice, judge, or magistrate."  Syllabus Point 6, *In re Watkins*, 233 W.Va. at 172, 757 S.E.2d at 596.  "[I]t is clearly within this Court's power and discretion to impose multiple sanctions against any justice, judge or magistrate for separate and distinct violations of the Code of Judicial Conduct and to order that such sanctions be imposed consecutively."  Syllabus Point 5, *In re Toler*, 218 W.Va. 653, 625 S.E.2d 731 (2005).

"Under our Constitution, only the Legislature has the power to remove a [circuit] court judge from office, and it may do so only by impeachment."  *In re Watkins*,

27

233 W.Va. at 174, 757 S.E.2d at 598.[13] "This Court has the inherent power to inquire into the conduct of justices, judges and magistrates, and to impose any disciplinary measures short of impeachment that it deems necessary to preserve and enhance public confidence in the judiciary." Syllabus Point 8, *In re Watkins*, 233 W.Va. at 173, 757 S.E.2d at 597. The limited constitutional power of this Court includes the authority to suspend a judge from office for a period of years that may equal or exceed the remainder of his or her term.

The sexual conduct of a judge in his or her private life may constitute a violation of the Code of Judicial Conduct when that conduct undermines the public's confidence in the judiciary. *See, e.g., In re Lee*, 336 So.2d 1175 (Fla. 1976) (disciplining judge for engaging in sexual activities in an automobile on a public parking lot with a woman who was not his wife); *Matter of Fournier*, 325 S.C. 194, 480 S.E.2d 738 (1997) (disciplining judge who regularly met with a woman and engaged in sexual activity in his car in a business's parking lot); *In re Snyder*, 336 N.W.2d 533 (Minn. 1983) (judge disciplined for adulterous relationship, a misdemeanor offense).

When the sexual misconduct of a judge occurs in the judge's chambers or courtroom, it is usually unquestionable that the judge's actions have impaired the honor,

---

[13] We repeatedly noted in *Watkins* that removal of a circuit or family court judge may only be accomplished through impeachment by the Legislature. *See W.Va. Const.*, Art. VIII, §§ 8 & 16. A circuit or family court judge "who is impeached is not only removed from office but is also disqualified from holding any future 'office of honor, trust or profit, under the State'" and also "forfeits all rights to a state pension." *In re Watkins*, 233 W.Va. at 179, 757 S.E.2d at 599.

28

integrity, dignity, and efficiency of the judiciary. The judge's actions violate the Code of Judicial Conduct. *See, e.g., In re Toler*, 218 W.Va. 653, 625 S.E.2d 731 (2005) (magistrate disciplined after being charged with sexual abuse of individuals in his office); *Matter of Hey*, 193 W.Va. 572, 457 S.E.2d 509 (1995) (judge disciplined for sexually harassing female court employees, including unwanted and unwelcome touching, unwanted and unwelcome kissing, making crude sexual comments, and asking for sexual favors). Many judges have been disciplined for engaging in sexual relationships during court hours, on court premises,[14] with court employees,[15] or with individuals who appeared before the judge in the exercise of his or her official duties.[16] "A judge's conduct is held to a higher standard than that of the average citizen, and must be beyond reproach, at least when that conduct is directly connected to his professional office and

---

[14] *See, e.g., In re Hammond*, 224 Kan. 745, 585 P.2d 1066 (1978) (judge disciplined for having sexual relations in his chambers with one female employee, demanding sexual relations with another, and making sexual relations a condition of continued employment); *In re Harrelson*, 376 S.C. 488, 657 S.E.2d 754 (2008) (judge disciplined after engaging in sexual encounters with two different married administrative assistants employed by the court).

[15] *See In re Miller*, 949 So.2d 379 (La. 2007) (judge removed from office for adulterous sexual relationship with his court secretary, fathering a child with the secretary, and later presiding over his secretary's divorce proceedings).

[16] *See In re Gerard*, 631 N.W.2d 271 (Iowa 2001) (judge disciplined for having secret intimate relationship with assistant county attorney who appeared before him on a daily basis); *In re Chrzanowski*, 465 Mich. 468, 636 N.W.2d 758 (2001) (judge disciplined after appointing attorney, with whom she was having an intimate relationship, as counsel for indigent criminal defendants); *In re Adams*, 932 So.2d 1025 (Fla. 2006) (judge disciplined for entering into romantic relationship with lawyer who practiced before him, and then continuing to preside over matters in which the lawyer appeared as counsel).

functions." *In re Flanagan*, 240 Conn. 157, 190, 690 A.2d 865, 881 (1997) (judge disciplined for engaging in a consensual affair with a married court reporter assigned to his courtroom).[17]

The commentary to Canon 2 of the Code of Judicial Conduct best summarizes the guideline:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

> The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge.

In this case, the Hearing Board concluded that Judge Wilfong eventually agreed not to contest the six violations of Canons 1, 2A and 2B of the Code of Judicial Conduct "because it was not credible to do so[.]" The Hearing Board found the evidence established five violations of Canons 3(C)(1), 3(C)(2), 3E(1), and 4A. Her multiple,

---

[17] As another court said,

> Judges, like Caesar's wife, should always be above suspicion. An impartial and disinterested trial judge is the foundation on which the military justice system rests, and avoiding the appearance of impropriety is as important as avoiding impropriety itself.

*United States v. Berman*, 28 M.J. 615, 616 (A.F.C.M.R. 1989) (reversing six criminal convictions after discovery trial judge had intimate relationship with trial counsel).

irresponsible improprieties undermined public confidence in the integrity, dignity, and efficiency of the judiciary in Randolph County. Judge Wilfong intertwined her private misconduct and professional acts to such a degree that even the lawyer for the county commission viewed her activities as "stunningly inappropriate, particularly regarding her abuse of her authority."

"Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist." Syllabus Point 3, *In re Cruickshanks*, 220 W.Va. 513, 648 S.E.2d 19 (2007).

Applying the *Cruickshanks* analysis, we first find that Judge Wilfong's misconduct impacted directly upon the administration of justice and withered the public's perception of the administration of justice in Randolph County. Second, although her misconduct initially may have begun as a private sexual relationship, because of the way she elected to conduct that relationship it became intertwined with her official duties and the public's perception of Judge Wilfong. Third and fourth, while Judge Wilfong's

31

misconduct did not involve violence and did not involve criminal activity, it did involve an arrogant degree of insensitivity to her staff, to courthouse personnel, to the duties of the prosecuting attorney, and to local lawyers. Finally, mitigating and aggravating factors exist which should be considered in weighing the discipline we should impose.

The Hearing Board noted the following mitigating factors: the five complaints in this case are the first disciplinary complaints filed against Judge Wilfong since her judicial service began in 2003. She has performed her official duties in a satisfactory manner, and was involved in a number of initiatives to improve the judicial system. No litigant complained that Judge Wilfong's inappropriate relationship influenced her discretionary rulings. She has the support of some individuals in the community and her family, including her husband. And finally, after a period of two years, Judge Wilfong did self-report.

The Board noted the following aggravating factors: Judge Wilfong compromised individuals with whom she worked and/or over whom she had power as the only circuit judge in Randolph County, including members of the local bar. By privately disclosing the existence of the relationship while implicitly and/or expressly requesting these individuals keep her secret, Judge Wilfong patently created and fostered obvious and multiple conflicts of interest. She also used her power as a circuit judge to further her improper relationship with Mr. Carter.

Moreover, Judge Wilfong was well-aware of the ethical implications of her two-year-plus relationship with Mr. Carter before she self-reported. She repeatedly represented to court employees, officers, and attorneys who were genuinely concerned

32

about her and the ethical quandary arising from her conduct, that she was ending or had ended the relationship – and then, she either continued or resumed the relationship without telling those employees, officers or attorneys she had done so.[18] Judge Wilfong demonstrated, over a two-year period, a fundamental lack of candor, judgment, integrity, and fairness.

As another aggravating factor, the Hearing Panel found that Judge Wilfong only self-reported her conduct after being told by Chief Counsel that the Judicial Investigation Commission had learned of her relationship with Mr. Carter, and after being told by Mr. Jory that local lawyers were contemplating filing official complaints. The Hearing Board also noted the administrative and financial burdens she imposed on the judiciary, including the recall of senior status judges to do her job, engendered as a result of her disqualification from all cases handled by the prosecuting attorney and several local lawyers. Further, the Hearing Board noted the potentially irreversible damage to her relationships with the local bar, county officials, and members of the public. And finally, while Judge Wilfong conceded to many of the factual allegations in the April 2014 statement of charges in her response, she persisted in her denial of any violations of

---

[18] We note that, in her brief, Judge Wilfong insists that she is not really at fault because she intended to break off the relationship but was driven to continue because Mr. Carter wanted to continue or resume the relationship. At oral argument, her lawyer insisted she had been "seduced" by Mr. Carter. These claims are directly contrary to her statements that she takes full responsibility for her actions – which, we are reminded, occurred over at least 24 months, if not longer.

the Code of Judicial Conduct until only a few days before the August 2014 hearing before the Hearing Panel.

In light of Judge Wilfong's eleven violations of seven Canons of the Code of Judicial Conduct, the Hearing Board unanimously recommended that this Court censure Judge Wilfong for each of the eleven violations of the Code of Judicial Conduct; suspend her for three years without pay; fine her the sum of $20,000; and order that she pay the costs of this proceeding.

After careful consideration, we modify the sanctions recommended by the Hearing Board. First, this Court must "take care to respect and observe the people's categorical right to choose their own judges, and to avoid interfering with that right except for manifest violations of the Code of Judicial Conduct." *In re Disciplinary Proceedings Against Turco*, 137 Wash. 2d at 245, 970 P.2d at 740. When members of this Court questioned whether Judge Wilfong's three-year suspension could continue beyond her theoretically winning an election in 2016, special counsel conceded that Judge Wilfong's sanction could fairly be reduced to cover only her remaining time in office. *See, e.g., In re Watkins*, 233 W.Va. at 183, 757 S.E.2d at 607 (suspending judge without pay "until his present term of office ends on December 31, 2016").[19]

_____

[19] We note, however, that "[t]here is ample precedent for suspending a judge beyond his present term of office." *Matter of Del Rio*, 400 Mich. 665, 672 n.4, 256 N.W.2d 727, 729 n.4 (1977). *See In re Toler*, 218 W.Va. 653, 625 S.E.2d 731 (2005) (magistrate was elected while criminal charges were pending; following acquittal, this Court suspended magistrate for four years for misconduct in prior term, "effectively suspending magistrate beyond his present term in office"). *See also, In re Disciplinary Proceedings Against Turco*, 137 Wash. 2d 227, 970 P.2d 731 (1999) (suspending judge

(continued . . .)

34

Accordingly, we find that Judge Wilfong should be suspended until her present term of office ends on December 31, 2016.

Second, we modify the $20,000 fine imposed upon Judge Wilfong. We generally defer to the analysis and recommendations of the Hearing Board, and we are incensed at the financial burden Judge Wilfong's misconduct has imposed upon the public fisc. This financial imposition is likely to continue into the future. In her zeal to defend her job, Judge Wilfong fails to recognize that she is now disqualified by the appearance of impropriety from doing most of her job. In fairness to the prosecuting attorney and many other lawyers in Randolph County, Judge Wilfong cannot preside – by her estimate – in over 80% of the cases presented in Randolph County. In addition to

---

until end of term, and prohibiting judge from holding future judicial office without training); *Matter of Carrillo*, 542 S.W.2d 105 (Tex. 1976) (removing judge for conduct occurring prior to election); *In re Greenberg*, 442 Pa. 411, 280 A.2d 370 (1971) (suspending judge for conduct that occurred before judge ascended to bench); Alex B. Long, "'Stop Me Before I Vote for This Judge Again': Judicial Conduct Organizations, Judicial Accountability, and the Disciplining of Elected Judges," 106 W.Va. L. Rev. 1, 28 (2003) ("In states that employ partisan or non-partisan elections to select their judges, the goal of judicial accountability takes precedent over the goal of judicial independence."); Jeffrey M. Shaman, "Judicial Ethics," 2 Geo. J. Leg. Ethics 1, 14 (1988).

We also note that "the fact that a judge or magistrate is no longer in office does not render a disciplinary proceeding moot." *W.Va. Judicial Hearing Bd. v. Romanello*, 175 W.Va. 577, 578, 336 S.E.2d 540, 541 (1985). *See also Matter of Probert*, 411 Mich. 210, 225, 308 N.W.2d 773, 776 (1981) ("When a judge charged with misconduct removes himself from judicial office to avoid the notoriety and ignominy incident to disciplinary proceedings and the possibility of sanctions, censure, if deserved, may be essential to 'the preservation of the integrity of the judicial system' . . . because the alternative, silence, may be construed by the public as an act of condonation."); *In re Steady*, 161 Vt. 636, 637, 641 A.2d 117, 118 (Vt. 1994) ("Even after leaving office, an ex-judge retains the status of the judicial office on his resume. The public is entitled to know if the record is tarnished.").

Judge Wilfong's $126,000 annual salary, in less than six months this Court has thus far had to spend nearly $53,000 of the taxpayer's money for senior-status judges to travel to Randolph County to perform in her stead. This Court will likely have to continue to pay those costs so long as Judge Wilfong remains a circuit judge. Further, the Randolph County Commission has tallied nearly $50,000 in expenses investigating her affair.

However, justice must be mixed with a little mercy.[20] We are suspending Judge Wilfong from her job for the remainder of her term without pay. She cannot ethically take pay from any other job while she continues as a suspended judge. Should Judge Wilfong choose to resign her position, she will likely be without pay for some time still. This Court is still requiring that she pay the costs of prosecuting the charges against her, which are currently estimated to be around $8,000. And, of course, her stunningly inappropriate conduct has been revealed to the public, to her obvious embarrassment. We therefore choose to eliminate any fine from her sanction.

Judge Wilfong's conduct seriously demeaned her office, impaired the integrity of the judiciary and substantially undermined public confidence in the administration of justice in Randolph County. Her conduct therefore warrants a substantial sanction. However, this Court is ever mindful that we discipline a judge not for purposes of punishment, vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a

---

[20] *See Lawyer Disciplinary Bd. v. Brown*, 223 W.Va. 554, 562, 678 S.E.2d 60, 68 (2009) (Ketchum, J., dissenting); *In re Reinstatement of DiTrapano*, 760 S.E.2d 568, 587 (W.Va. 2014) (Ketchum, J., dissenting).

free society. "We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned." *In re LaMotte*, 341 So.2d 513, 517 (Fla. 1977).

## IV.
## CONCLUSION

This Court imposes the following discipline upon the respondent, Judge Jaymie Godwin Wilfong:

1. Judge Wilfong is censured on each of her eleven violations of the Code of Judicial Conduct.

2. Judge Wilfong is forthwith suspended, without pay, from her office as judge of the Twentieth Judicial Circuit until her present term of office ends on December 31, 2016.

3. Judge Wilfong is ordered to pay all costs associated with the investigation and prosecution of the violations proven in these proceedings.

The Clerk of this Court is ordered to issue the mandate forthwith.

Suspension without pay and other sanctions ordered.

37