IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2024 Term

No. 22-862

FILED

March 18, 2024

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

In the Matter Of:

THE HONORABLE DEANNA R. ROCK,
FAMILY COURT JUDGE OF THE TWENTY-THIRD FAMILY COURT CIRCUIT

_____

DISCIPLINARY PROCEEDING

REPRIMAND
AND OTHER SANCTIONS

_____

Submitted:  January 23, 2024
Filed:  March 18, 2024

Rachael L. Fletcher Cipoletti, Esq.
Special Judicial Disciplinary Counsel
Charleston, West Virginia
Attorney for West Virginia Special Judicial
Investigation Commission

Lonnie C. Simmons, Esq.
DiPiero Simmons McGinley
& Bastress, PLLC
Charleston, West Virginia
Attorney for Respondent

JUSTICE WOOTON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "'The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings.' Syl. pt. 1, *W. Va. Judicial Inquiry Commission v. Dostert*, 165 W. Va. 233, 271 S.E.2d 427 (1980)." Syl., *In re Hey*, 193 W. Va. 572, 457 S.E.2d 509 (1995).

2. """Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.'" Syllabus Point 4, *In Re Pauley*, 173 W. Va. 228, 235, 314 S.E.2d 391, 399 (1983).' Syllabus Point 1, *Matter of Hey*, 192 W. Va. 221, 452 S.E.2d 24 (1994)." Syl. Pt. 1, *In re Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

3. "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syl., *In re Gorby*, 176 W. Va. 16, 339 S.E.2d 702 (1985).

4. "Under Rule 4.12 of the Rules of Judicial Disciplinary Procedure [1998] the Judicial Hearing Board may recommend, or this Court may impose, one or more of the following sanctions for each violation by a justice, judge, or magistrate of the *Code of Judicial Conduct*: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement in limited

circumstances. Additionally, this Court can assess the cost of the disciplinary proceedings against a justice, judge, or magistrate." Syl. Pt. 6, *In re Watkins*, 233 W. Va. 170, 757 S.E.2d 594 (2013).

5. "Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist." Syl. Pt. 3, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

WOOTON, Justice:

This matter arises from the recommendation of the West Virginia Judicial Hearing Board (hereinafter "the Board") that respondent Deanna R. Rock, Family Court Judge of the Twenty-Third Family Court Circuit, be disciplined for three violations of the West Virginia Code of Judicial Conduct. These violations stem from alleged misrepresentations made by respondent to disciplinary authorities regarding her involvement with a letter written by a family court member of the Board; the letter addressed a pending disciplinary matter and lodged allegations of misconduct against Judicial Disciplinary Counsel ("JDC"). The Special Judicial Investigation Commission levied eight charges against respondent regarding those alleged misrepresentations and the Board found that respondent committed only three of the eight charged violations. As a result, the Board recommended that she be reprimanded and required to pay the costs of these proceedings.

Respondent objects to the Board's findings as to the three violations and asks to be exonerated as to those charges as well, claiming that her statements about her involvement with the letter were not intentionally false, but the result of faulty memory. Special Judicial Disciplinary Counsel ("SJDC") likewise objects to the recommended discipline and requests that the Court find respondent committed the five additional charged violations and enhance her sanction to a censure, $5,000 fine, and suspension until the end of her term.

1

This Court has before it all matters of record, including the parties' stipulations, a transcript of the evidentiary hearing conducted by the Board and the exhibits introduced, as well as the briefs and arguments of counsel. Based on this Court's independent review of the record, we agree with the Board's conclusion that respondent committed two violations of Rule 2.16(A) and one violation of Rule 1.1 of the West Virginia Code of Judicial Conduct; however, we also find that respondent's conduct violated Rule 1.2 as alleged in the statement of charges. We nonetheless adopt the Board's recommended discipline and find it appropriate that respondent be reprimanded and directed to pay the costs of the proceedings.

## I. FACTS AND PROCEDURAL HISTORY

Respondent has been a member of the West Virginia State Bar since 2004 and was elected to serve as a Family Court Judge in the 23rd Family Court Circuit for a term commencing in 2017. For much of the pertinent time period, respondent was also the President of the West Virginia Family Court Judicial Association ("WVFCJA"). She has never been previously disciplined as a lawyer or judge. Although respondent's conduct in this matter relates to alleged misrepresentations to disciplinary authorities, those alleged misrepresentations were provided in conjunction with and/or relate to two separate disciplinary matters. To provide necessary context for respondent's conduct, our discussion requires that we delve into those matters and the surrounding circumstances.

THE GOLDSTON JUDICIAL DISCIPLINARY PROCEEDING

In late 2020, judicial complaints were filed against two family court judges for conducting so-called "judicial views" or "home visits" wherein they would personally inspect property and/or enter the homes of divorce litigants in proceedings before them for purposes of resolving personal property disputes. The most notable of these judicial complaints involved Family Court Judge Louise Goldston ("Goldston"); a majority of this Court determined that such "views" constitute warrantless searches and that Goldston should be censured and fined $1,000.00 for her conduct with regard to one such search. *See In re Goldston*, 246 W. Va. 61, 73, 866 S.E.2d 126, 138 (2021) (finding Goldston "left her role as an impartial judicial officer and participated in an executive function when she entered the . . . home to oversee the search").

As President of the WVFCJA—as well as a colleague and friend—respondent communicated with Goldston during her disciplinary proceedings. For purposes of those proceedings, respondent also collaborated behind the scenes with other family court judges in defense of the propriety of the "judicial views."[1] Respondent believed that ethical violations attached to these "views" could negatively impact the family court judiciary. Regardless, Goldston stipulated to various violations of the Code of Judicial Conduct in her disciplinary proceeding relating to one particular "view" and

---

[1] Respondent explained that Goldston was concerned about mounting legal fees and therefore she and other family court judges collaborated to perform legal research on the issue of whether family court judges are authorized to conduct these "judicial views."

3

requested that respondent and/or other family court judges send character letters to JDC on her behalf.

Respondent and two other family court judges—David Greenberg and Mary Ellen Griffith—sent letters in support of Goldston's character to JDC in October 2020. In response to those letters, JDC Brian Lanham telephoned respondent and advised that the letters had been presented to the Judicial Investigation Commission (the "Commission"), which determined that the letters violated various provisions of the Code of Judicial Conduct including Rule 3.3 which provides that a judge "shall not testify as a character witness in a judicial, administrative, or other adjudicatory proceeding or otherwise vouch for the character of a person in a legal proceeding, except when subpoenaed to testify." JDC Lanham followed up on this call with a confirmatory letter to respondent and the others, which he characterized as a "warning letter."[2]

Goldston's disciplinary hearing was held on January 15, 2021; shortly after that hearing, JDC Teresa Tarr moved to disqualify Board member Family Court Judge Glen Stotler ("Stotler") from the proceedings. JDC contended that, based upon the manner and content of comments made by Stotler during the disciplinary hearing suggesting the charges were meritless, Stotler demonstrated bias and prejudice against JDC. Stotler refused the recusal request. On March 16, 2021, the Board issued its recommended

---

[2] Contemporaneous with this exchange, the Commission issued an advisory opinion to this effect.

4

decision in the Goldston matter, with Stotler dissenting and opining that, despite Goldston's stipulations, no violation of the Code of Judicial Conduct had been established. Both Goldston and JDC objected to the recommended findings and the matter was placed upon this Court's argument docket.

THE "STOTLER LETTER"

Shortly after the Board issued its recommended decision in the Goldston matter, Stotler submitted a letter dated March 25, 2021, to then-Chief Justice Evan Jenkins lodging a complaint against and requesting an investigation of JDC (the "Stotler letter"). Relative to JDC's handling of the Goldston and other judicial disciplinary matters, Stotler accused JDC of "abusing its power and authority" in the manner in which its attorneys investigated and interviewed judges. The letter further castigated JDC Tarr for her "questionable and unacceptable" response to his questioning during the Goldston matter. Respondent was copied on the letter as President of the WVFCJA, along with members of this Court, its Administrative Office, and the West Virginia Legislature. Stotler later provided a copy of the letter to the Chair of the Commission, Judge Alan Moats, who forwarded it to the Office of Disciplinary Counsel; that office opened an investigation into JDC Tarr and Lanham in April 2021.

On May 13, 2021, the Investigative Panel of the West Virginia Lawyer Disciplinary Board issued its report on the investigation of JDC Tarr and Lanham, finding no merit to Stotler's complaint and closing the matter. On May 25, 2021, Supreme Court

5

Administrative Director Joseph Armstrong filed a complaint against Stotler with the Commission with regard to the Stotler letter. A formal statement of charges was filed against him in March 2022.[3]

THE "MOATS LETTER"

Shortly after the Stotler letter was sent, on April 6, 2021, respondent and Judges Greenberg and Griffith jointly wrote to Lisa Tackett, Director of the Division of Court Services, regarding the "warning letter" JDC Lanham sent them in October about the Goldston character letters. They questioned JDC's authority to issue a warning letter and expressed concern about the effect of the warning letter on their disciplinary record, as well as its potential use against them in future matters. They claimed that the West Virginia Rules of Judicial Disciplinary Procedure contained no authority for the issuance of a "warning," particularly without permitting a judge to challenge JDC's characterization of

---

[3] As a result of these charges, Stotler stipulated to three violations of the Code of Judicial Conduct for forwarding the Stotler letter to this Court while the Goldston matter was pending. He stipulated to violating Rule 2.10 regarding judicial statements on pending or impending cases, as well as Rule 1.1 and 1.2 requiring judges to comply with the law and avoid the appearance of impropriety. JDC and Stotler jointly recommended that he be reprimanded and charged with costs; this Court adopted that recommendation in October 2023.

their conduct.[4] In that regard, on April 23, 2021, respondent and the others jointly wrote to JDC Tarr and requested an advisory opinion on JDC's authority to issue warnings.

On April 27, 2021, JDC Tarr wrote to respondent and the others notifying them that she and JDC Lanham had disqualified themselves from handling complaints "involving Judge Stotler or *any other Judge who may have helped in the submission of [the Stotler letter]*" and that, because the requested advisory opinion "relates in part to the Stotler matter," they were disqualifying themselves as to the request as well. (Emphasis added). Per emails from respondent regarding the letter, as well as her subsequent testimony, she took umbrage at the suggestion— under her reading of the letter—that JDC Tarr was accusing her of having "helped with" the Stotler letter.

In response, on April 30, 2021, respondent and Judges Greenberg and Griffith jointly wrote to Judge Moats as Chair of the Commission (the "Moats letter") to express concerns about JDC Tarr's recusal letter. The Moats letter states that JDC Tarr's recusal letter contains a "strong and unfounded implication that each of us were involved in the drafting and the submission of [the Stotler letter]" and that this implication is "completely without merit or foundation[.]" The three judges denied that they were "involved with the concept or writing of [the Stotler letter]" and stated "there is *NO*

---

[4] Respondent explained that her specific concern stemmed from her intention to apply for a seat on the West Virginia Intermediate Court of Appeals and whether she would be required to disclose this warning and/or whether it would be released as part of the application process.

*association between the three of us* and the *writing* or *sending* of Judge Stotler's letter." (Emphasis added).[5]  The Moats letter is signed by all three family court judges including respondent.

RESPONDENT'S SWORN STATEMENT AND ENSUING COMPLAINT

In the course of SJDC's investigation of the complaint against Stotler, SJDC delved into the drafting and submission of the Stotler letter.  To that end, SJDC took a sworn statement from Stotler's assistant, Joy Renee Campbell, who testified that she did not email or fax the letter to anyone for review prior to it being mailed and specifically denied speaking with respondent about it.  SJDC then requested respondent provide a sworn statement.  Respondent requested additional information about the subject matter of the sworn statement and was issued an investigative subpoena identifying Stotler as the subject of the investigation; respondent obtained the complaint against Stotler from him in advance of her sworn statement.

On January 31, 2022, SJDC conducted a sworn statement of respondent regarding, among other things, her knowledge of and involvement with the Stotler letter.

---

[5] The Moats letter further states that the three judges had "lost all faith" in JDC Tarr and Lanham's ability to be impartial or unbiased toward them and that they "welcome[d]" their recusal from "anything that has to do with any of us . . . now or in the future."  On June 28, 2021, Judge Moats responded, advising that the Commission voted to decline the request for an advisory opinion because it did not comport with West Virginia Rule of Judicial Disciplinary Procedure 2.13 regarding advisory opinions.

During the statement, respondent maintained that she first became aware of the Stotler letter when it appeared on her desk in an envelope from Stotler:

> Q.    When you received [the Stotler letter] . . . was that the first time that you had seen or heard about the contents of the letter?
>
> A.    Yes.

Respondent also denied speaking with Stotler about the letter prior to its receipt:

> Q.    Did Judge Stotler speak to you about the contents of the letter before he sent it to you on the 25th?
>
> A.    No.
>
> Q.    Even to say I'm sending you a letter?
>
> A.    No.

Respondent further denied having disseminated the Stotler letter to the press, including the *West Virginia Record*, which reported on it.[6]  SJDC posed additional questions regarding the Goldston matter specifically, including whether respondent had "conversations" with Stotler about the Goldston matter.  Respondent testified that she knew that she could not discuss the Goldston matter with Stotler due to his position on the Board and did not do so until a May 2021 WVFCJA meeting, after the Board had issued its decision in the Goldston matter.

---

[6] As to the latter, the *West Virginia Record* was anonymously provided the Stotler letter, the header of which contained a fax transmittal line designated "Stotler/Rock." Respondent admitted to faxing the letter to at least one and possibly more family court judges but denied sending it to the press.  SJDC now appears to have accepted respondent's explanation that someone to whom respondent faxed the letter—and not respondent—provided it to the press.

On March 29, 2022, SJDC notified respondent through her counsel that a judicial ethics complaint had been opened against her. The complaint was based upon alleged misrepresentations during respondent's January 2022 sworn statement, as follows: 1) denying that she was involved in the "drafting, editing, or any preparation of" the Stotler letter; 2) denying that she spoke to Stotler about the letter prior to its receipt; 3) denying that she disseminated the Stotler letter to the press; and 4) denying that she spoke with Stotler about the Goldston matter before May 2021 or "sen[t] or provid[ed]" him information pertaining to the Goldston matter.[7]

Importantly, along with the notice of complaint, SJDC provided respondent's counsel with printouts of certain data from respondent's Court-issued computer including instant messages ("IM"s) between respondent and Ms. Campbell. This computer data reveals that on March 19, 2021—six days before the date of the Stotler letter—Ms. Campbell emailed respondent a draft of the Stotler letter which was downloaded onto her computer that date.

The computer data further indicates that on the following Monday—March 22, 2021—IMs were exchanged between respondent and Ms. Campbell regarding whether Stotler had received a fax from respondent that "Judge Jim Douglas wants him to see" and which she "would rather not email[.]" IMs that same day also reveal that Ms. Campbell

---

[7] *But see* discussion *infra* comparing allegation in statement of charges with questions posed on this issue.

10

inquired of respondent about her title with the WVFCJA and that of Keith Hoover of this Court's Administrative Office—both of whom were copied on the final version of the Stotler letter.[8] On March 24, 2021, Ms. Campbell inquired of respondent via IM whether she had received a fax from Stotler. In response, respondent acknowledged receipt of the fax, identified a missing page, and later identified a typo on page two of the faxed document stating that the year 1956 should be placed in parentheses.[9] Her final IM to Ms. Campbell that date states: "[O]verall, the letter looks good. Please ask Judge to call me before you mail this." Moreover, the computer data reveals that in early April, 2021, draft objections to the recommended decision in the Goldston disciplinary matter, which had been forwarded by Goldston to respondent, were then forwarded by respondent to Stotler via email twice without commentary. None of this computer data was presented to respondent prior to or during her sworn statement.

In response to the complaint and computer data, respondent's counsel wrote to SJDC and indicated that upon review of the computer data, respondent's memory was "refreshed" and she wanted to "correct[]" her sworn statement and "ensure the accuracy of the record[.]" Respondent, through counsel, conceded that she now recalled that she did see the Stotler letter before she received it on her desk, "made some minor suggestions,"

---

[8] Respondent testified she did not know why Ms. Campbell was inquiring about these names and titles at the time.

[9] The final version of the Stotler letter contains a citation to a 1956 case which purportedly pertained to the authority of a judge to conduct a "judicial view."

and requested that Stotler call her before mailing. Respondent's counsel conveyed that respondent wanted to inquire as to whether Stotler was actually going to mail the letter or was "simply [] venting" but did not ultimately speak with him before its mailing. Her counsel conveyed that respondent took issue with the allegation that she falsely denied "drafting, editing, or preparing" the Stotler letter, claiming she was never asked this specific question during her statement and admitting only to "proofreading it and making a few suggested corrections"—none of which constituted "drafting, editing, or preparing." Insisting that respondent simply did not recall having seen the letter previously, respondent's counsel referred SJDC to that portion of the sworn statement where respondent explained that she was often called upon to proofread professional correspondence or writings in her role with the WVFCJA because she was "the grammar person." Respondent reiterated her denial of forwarding the Stotler letter to the press and professed to have no recall of sending the Goldston draft objections to Stotler.

Respondent gave a second sworn statement in July 2022, reiterating that she did not intentionally give false information during her first sworn statement but simply did not recall seeing or offering edits to the Stotler letter prior to receiving it on her desk. Respondent insisted that she likely did not recall her proofreading efforts because the content of the letter was not "impactful" for her and did not "resonate" with her because it "wasn't [her] letter." Respondent further attempted to explain her memory failure by testifying that she had a lot on her mind at the time of her sworn statement including health issues, looking for a new assistant, working on legislative initiatives, as well as her

12

uncertainty about the scope of the sworn statement. As to the latter, respondent suggested that she was precluded from reviewing her own files to determine her involvement with the letter in advance of the statement because she was not provided sufficient detail about the statement's scope.

THE STATEMENT OF CHARGES AND DISCIPLINARY PROCEEDINGS

In November 2022, a formal statement of charges was issued containing eight charges for various violations of the West Virginia Code of Judicial Conduct, as follows: five charges of failure to cooperate with disciplinary authorities for various misstatements in violation of Rule 2.16(A);[10] one charge of failure to comply with the law in violation of Rule 1.1;[11] one charge of failure to promote confidence in the judiciary in

---

[10] Rule 2.16(A) provides: "A judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies." The "failure to cooperate" violations comprise charges three through seven of the statement of charges and are based on the following alleged misrepresentations: Charge 3—denying in her sworn statement that she provided Goldston's draft objections to the Board's recommended decision to Stotler; Charge 4—denying in her sworn statement that she had "seen or heard" about the Stotler letter prior to receiving it in the mail; Charge 5—denying in her sworn statement that she discussed the Stotler letter with him prior to her receipt of it; Charge 6—"testif[ying] under oath . . . that she had nothing to do with the letter and did not help with the letter"; and Charge 7—stating in the Moats letter that there was "'NO association between the three of us and the writing or sending'" of the Stotler letter.

[11] Rule 1.1 provides: "A judge shall comply with the law,* including the West Virginia Code of Judicial Conduct."

13

violation of Rule 1.2;[12] and one charge of abusing the prestige of judicial office by "advanc[ing] the allegations of misconduct about JDC" and requesting its recusal in matters involving her and the other two family court judges in violation of Rule 1.3.[13] *See supra* n.5.

## THE DISCIPLINARY HEARING AND RECOMMENDED DECISION

On March 22, 2023, respondent testified before the Board, largely restating the defenses outlined above, and called two character witnesses to speak to her integrity and honesty. Ms. Campbell also testified and claimed that, like respondent, she simply did not remember faxing the Stotler letter to respondent or having previously communicated with her about it at the time of her sworn statement.

On May 25, 2023, the Board issued its recommended decision pursuant to Rule 4.8 of the West Virginia Rules of Judicial Disciplinary Procedure, finding only three of the eight alleged violations proven by clear and convincing evidence.[14] The Board

---

[12] Rule 1.2 provides: "A judge shall act at all times in a manner that promotes public confidence in the independence,* integrity,* and impartiality* of the judiciary, and shall avoid impropriety and the appearance of impropriety."

[13] Rule 1.3 provides: "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests* of the judge or others, or allow others to do so."

[14] The Board's vote on the recommended decision was 6-1; Judges Michael D. Lorensen and Andrew Dimlich recused themselves and Family Court Judge Brittany Ranson Stonestreet dissented.

14

found that respondent committed two violations of Rule 2.16(A) by 1) falsely denying having previously "seen or heard" of the Stotler letter as alleged in Charge Four, and 2) falsely denying any "association" with it in the Moats letter as alleged in Charge Seven. As to these findings, the Board concluded that respondent's contention that she forgot she had seen and reviewed the Stotler letter was "not credible" in view of her proofreading edits and approval. For the same reasons, the Board further found that respondent was "less than candid" in the Moats letter by denying any "association" with the Stotler letter. The Board found that these violations also resulted in a concurrent violation of Rule 1.1 requiring a judge to comply with the law as alleged in Charge One.

However, as to the remaining charges, the Board found that 1) respondent was credible in her explanation that any transmittal of Goldston's draft objections to Stotler was inadvertent and that she did not discuss the Stotler letter with him before he sent it; 2) respondent did not falsely disclaim that she "draft[ed], edit[ed], or revise[d]" the Stotler letter because she merely "proofread" it; and 3) respondent's request that JDC Tarr and Lanham recuse themselves was not an attempt to abuse the prestige of her office, but merely an expression of concern about their involvement. Finally, as to the alleged Rule 1.2 violation, the Board found that respondent's actions did not bear on public confidence in the judiciary because none of her actions were in furtherance or performance of her judicial duties.

Insofar as the recommended discipline, the Board similarly found that respondent's conduct did not affect the public's perception of the administration of justice because it did not arise from performance of her judicial duties and related more to personal matters than public ones. The Board further found that the charges did not involve violence or callous disregard for justice, there were no criminal repercussions from the charges, and respondent had no prior complaints. Accordingly, the Board recommended that respondent be reprimanded and required to pay the costs of these proceedings. Both respondent and SJDC objected to the Board's recommended decision.[15]

## II. STANDARD OF REVIEW

With respect to discipline for violations of the West Virginia Code of Judicial Conduct, "'[t]he Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings.' Syl. pt. 1, *W. Va. Judicial Inquiry Commission v. Dostert*, 165 W. Va. 233, 271 S.E.2d 427 (1980)." Syl., *In re Hey*, 193 W. Va. 572, 457 S.E.2d 509 (1995). "The independent evaluation of the Court shall constitute a *de novo* or plenary review of the record." *In re Starcher*, 202 W. Va. 55, 60, 501 S.E.2d 772, 777 (1998). Allegations in a complaint must

---

[15] SJDC's written objection was limited to the Board's recommended *sanction*; however, in its brief, SJDC also asks the Court to find that respondent committed the violations on which the Board exonerated her. Because SJDC's written objection referenced only the recommended discipline, respondent argues that SJDC may not "relitigate" the exonerated charges. However, because this Court is obligated to conduct a de novo review of the proceedings and is the final arbiter of judicial discipline, SJDC's lack of precision in its written objection presents no impediment to our consideration of all of the charged violations. *See infra* text regarding our standard of review.

16

be proved by clear and convincing evidence. *Id.* at 56, 501 S.E.2d at 773, syl. pt. 1. With these standards in mind, we turn now to consider the Board's recommendations.

## III. DISCUSSION

The bulk of the charges against respondent—and the parties' arguments herein—involve the alleged misrepresentations violative of Rule 2.16(A) of the Code of Judicial Conduct. As a result of the two Rule 2.16(A) violations found by the Board, it also found a concurrent violation of Rule 1.1 for failure to comply with the law, but exonerated respondent on a second, related charge for violation of Rule 1.2 regarding public confidence in the judiciary, which we address separately below. Finally, the Board found no violation of Rule 1.3 for "abuse of the prestige of judicial office" regarding respondent's request that JDC Tarr and Lanham recuse themselves indefinitely as to matters involving her; both SJDC and respondent offer little in regard to this charge.

A.     RULE 2.16(A), RULE 1.1, AND RULE 1.3 VIOLATIONS

Rule 2.16(A) provides that "[a] judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies." As indicated, the Board found that respondent violated this rule by "misrepresent[ing]" her involvement with the Stotler letter: by denying in her sworn statement that she had not previously "seen or heard" of the letter prior to receiving it on her desk and by disclaiming "association" with it in the Moats letter. Respondent, however, seizes upon that portion of the Board's recommended decision which states that, with regard to these misrepresentations, the Board "does not find clear

17

and convincing evidence that [] [r]espondent was *intentionally dishonest* but finds clear and convincing evidence that she was *less than candid*."  (Emphasis added).

In that regard, respondent argues that a Rule 2.16(A) violation requires proof of a "knowing and willful" misstatement and respondent—found credible by the Board as to certain issues—merely suffered a memory failure.  Respondent offers caselaw purporting to contrast the type of "intentional dishonesty" required to violate the rule with statements which were merely "mistakes"—which some courts have identified as being insufficient to violate the rule.  *See, e.g., In re Kroger,* 702 A.2d 64, 67 (Vt. 1997) ("[J]udges do not violate the Code when they unintentionally make false or misleading statements-that is, when they make mistakes."  (footnote omitted)).[16]

We acknowledge that this isolated language in the recommended decision may invite a semantical debate about the difference between a lack of candor and "dishonesty" and implicitly injects the concept of "intent" into Rule 2.16(A), which is silent

---

[16] Respondent directs us to *In re Williams*, 248 W. Va. 106, 887 S.E.2d 231 (2023), for the proposition that this Court has already declared that a "mere mistake" is insufficient to support a Rule 2.16(A) violation.  In *Williams*, a judge was charged with a Rule 2.16(A) violation for failing to disclose an incident during his sworn statement involving his inadvertent failure to pay for groceries.  248 W. Va. at 117-18, 887 S.E.2d at 242-43.  The Court found no Rule 2.16(A) violation for lack of candor because the incident was a "mistake" and therefore not something one would reasonably expect to be disclosed as wrongdoing to disciplinary authorities in the context of that case.  *Id*. at 125, 887 S.E.2d at 250.  The Court's reference in that opinion to a "mistake" plainly refers to the underlying incident *itself*—rather than the judge's failure to disclose it in his sworn statement.

in that regard.[17] However, we find it unnecessary to undertake an analysis of these issues because we disagree with respondent's underlying contention: that the Board believed that she suffered a simple lack of memory, i.e. made a "mistake," but nonetheless found her answers false and violative of Rule 2.16(A). To the contrary, the recommended decision expressly states that the Board found that "it is not credible that [respondent] forgot that she had seen and reviewed the Stotler letter."

In support of its findings, the Board very carefully and thoroughly evaluated the testimony and evidence, explaining why it found respondent's claim of innocent memory failure "unconvincing." The Board drew focus to respondent's testimony that she

---

[17] We observe that the Board elaborated on the distinction it drew between "intentional dishonesty" and "lack of candor," taking respondent to task for attempting to sanitize her denials by "parsing words." The Board noted that courts have observed that the requirement of candor "goes beyond technical truthfulness" and that "[p]arsing language, especially in the context of a judicial disciplinary investigation and when under oath, is not being 'candid'":

> Proofreading and pronouncing a draft letter "good" may not be drafting, revising, or preparing the letter but claiming not to have any "association" with the letter and not seeing it until it was sent when it was received, proofread, and returned with at least one correction and with contact information included in the letter is not credible and indicates *perhaps not intentional dishonesty, but a lack of candor.*

(Emphasis added). We find this discussion pertinent to the occasional imprecision of the questions posed during respondent's sworn statements as compared with her responses. Indeed, the occasional incongruence between the charged misrepresentations and the questions as phrased during respondent's sworn statement is a recurrent issue in the case. We believe the Board's recommended decision reflects its attempt to hold respondent accountable for only those statements which are false under any good faith interpretation of the question and response. *See infra* discussion and n.19.

19

likely forgot about her limited involvement with the Stotler letter because the letter was "inconsequential" and "not impactful" to her. The Board carefully debunked this explanation by noting that the Stotler letter lodged complaints against JDC in the specific context of the Goldston matter—a matter in which respondent admitted to being highly interested and peculiarly involved. The Board noted that 1) as President of the WVFCJA respondent had a professional interest in the Goldston matter; 2) she had discussed the issues in the case with another family court judge who also conducted "judicial views" like Goldston; and 3) as a result of her professional interest, she was actively assisting in certain aspects of Goldston's defense. We agree with the Board's assessment of this evidence, which demonstrates that respondent's claim that the Stotler letter was merely a benign piece of correspondence—which she perfunctorily reviewed as a professional courtesy and immediately disregarded—is not credible in context.

The Board similarly rejected respondent's suggestion that she forgot about her involvement with the letter because she was given such scant information regarding the sworn statement, providing her no opportunity to refresh her memory about it. The Board noted that respondent requested and received a subpoena identifying Stotler as the subject of the investigation and reviewed a copy of Stotler's disciplinary complaint—which was based entirely on the Stotler letter—prior to her sworn statement and therefore had every reason to know the likely focus of SJDC's questioning.

20

Moreover, the Board emphasized respondent's unequivocal denials of any involvement with the Stotler letter from the outset—none of which left room for the possibility that she may have had prior knowledge or involvement with the letter, but it had slipped her mind. The Board quoted respondent's testimony that JDC Tarr's disqualification letter suggesting she "helped with" the Stotler letter "really made me mad" because it was "borne of zero evidence" and "was an allegation against my character, against my ethics based on nothing." The Board further noted that portion of the Moats letter wherein the three judges "expressed resentment" at the implication they were involved with the Stotler letter and "would request an apology, but for the futility of it." The Board then juxtaposed respondent's "ire," "outrage," and "fervent denials" with the computer data revealing that, in fact, she not only previewed the letter, but offered proofreading edits and her approval of the letter by stating it "looks good" prior to its transmittal. We further note that—unlike her sworn statement which was taken approximately ten months after the Stotler letter and might arguably support a claim of faulty memory—these wholesale denials occurred a mere month after respondent previewed and proofread it and continued until she was confronted with the computer data showing the denials to be inaccurate.

In rejecting respondent's claims of memory failure, the Board plainly found that respondent recalled her involvement with the Stotler letter but was not forthcoming about it despite that being the obvious import of SJDC's inquiries, thereby demonstrating a lack of candor violative of Rule 2.16(A). Similarly, because the Board concluded that

21

respondent did not merely forget her prior involvement with the Stotler letter, in the Moats letter she falsely disclaimed any "association with" it—a further violation of Rule 2.16(A).[18] We agree and therefore reject respondent's contention that she has been unfairly saddled with ethical violations for having an imperfect memory.

Moreover, the Board very clearly identified the allegations for which it found respondent's exculpatory explanations credible and consistent with the evidence. As to respondent's denial that she spoke to Stotler prior to his sending the letter, the Board "credit[ed]" her testimony; while respondent may have requested to speak to Stotler prior to the letter being mailed, the Board noted that there was no evidence that she actually did. As to her denial of sending the draft objections to the Goldston recommended decision to Stotler, the Board "accept[ed]" respondent's testimony that any transmission was inadvertent.

The Board's findings as to this charge notwithstanding, however, we observe that SJDC fails to direct us to that portion of respondent's sworn statement where she falsely denied "provid[ing] the draft versions of the [Goldston] objections to [] Stotler" as alleged in Charge Three of the statement of charges. Notably, as to this charge, SJDC's brief references only that portion of the record where respondent denied she had a "role in

_____

[18] We further reject respondent's argument that because the denial of association in the Moats letter was phrased jointly, i.e., "there is NO association between *the three of us* and the writing or sending of Judge Stotler's letter" she cannot be singled out for a Rule 2.16(A) violation. (Emphasis added). To the contrary, this statement in the Moats letter— which respondent signed individually—is unquestionably false as pertains to her.

22

*drafting* of Judge Goldston's response to [JDC's] objections"—a decidedly different question altogether—which SJDC then mischaracterizes as a false denial of "*any* involvement" with Goldston's "pleadings." (Some emphasis added). Our review of her sworn statement indicates that she was never asked whether she provided the draft objections or any information or materials to Stotler regarding the Goldston matter—nor was she asked any question reasonably designed to elicit this admission.[19]

Although this Court has plenary review of judicial disciplinary matters, we have observed that "the Hearing Board is in a better position to resolve the factual disputes of a particular case[]" because its members "hear the testimony of the witnesses firsthand and are much closer to the pulse of the hearing to resolve such issues as credibility and conflict of facts." *In re Browning*, 192 W. Va. 231, 234 n.4, 452 S.E.2d 34, 37 n.4 (1994); *see also In re Ferguson*, 242 W. Va. 691, 698-99, 841 S.E.2d 887, 894-95 (2020) ("Even

---

[19] In absence of any proper citation to the record otherwise, we find only that SJDC asked respondent whether she had any "*conversations* with [] Stotler about anything having to do with *the Goldston case*"—without referencing a specific time period. (Emphasis added). More importantly, however, respondent was not charged with falsely denying "conversations" with Stotler about the Goldston matter (as opposed to "discuss[ing]" the Stotler letter with him as per Charge Five), and we do not find that forwarding, without commentary, a document via email is tantamount to having a "conversation" about a matter.

In this regard, while we agree that the Board correctly admonished respondent for attempting to "parse words" with respect to her unequivocal denials of any prior awareness of or involvement with the Stotler letter, charges are not properly brought regarding false replies to questions or issues perhaps alluded to but never asked. A judge's honesty and candor must be fairly assessed relative to the questions posed and as worded for purposes of Rule 2.16(A).

though we make an independent review of the record in judicial disciplinary cases, on this issue we will defer to the Board's credibility determinations and resolution of conflicting evidence." (footnote omitted)). Accordingly, "[s]ubstantial consideration . . . should be given to the findings of fact of the Hearing Board[]" and "absent a showing of some mistake or arbitrary assessment, findings of fact are to be given substantial weight." *Browning*, 192 W. Va. at 234 n.4, 452 S.E.2d at 37 n.4. In a case such as this, the Court is hard-pressed to substitute its judgment for the "collective and evaluative" discernment of the Board as to disputed issues of fact centering almost exclusively on the credibility of witnesses. *Id*. That said, however, we find the evidence and testimony entirely consistent with the Board's credibility and factual determinations and agree with its conclusions.

We therefore accept the Board's findings as to Charges Three through Seven involving the "failure to cooperate" violations and concur that respondent committed two violations of Rule 2.16(A). We further accept the Board's conclusion that, as a result of the Rule 2.16(A) violations, respondent likewise committed a concurrent violation of Rule 1.1 as alleged in Charge One. *See Ferguson*, 242 W. Va. at 699, 841 S.E.2d at 895 ("[B]y providing false information to the JDC during his sworn statement, the respondent also violated Rule 1.1."). Finally, we likewise agree with the Board's finding that respondent committed no Rule 1.3 violation as set forth in Charge Eight. [20]

---

[20] As to this charge, SJDC offers little more than conclusory argument that respondent attempted to "abuse the prestige of judicial office" to "force" the termination (continued . . .)

B.    CHARGE TWO:  FAILURE TO PROMOTE CONFIDENCE IN THE JUDICIARY

As discussed above, the Court defers to and agrees with the Board's credibility and factual determinations at the core of its recommended decision.  However, as pertains to Charge Two, we disagree with the Board's conclusion that respondent's misconduct did not impact public confidence in the judiciary in violation of Rule 1.2, which requires a judge to "act at all times in a manner that promotes public confidence in the independence,* integrity,* and impartiality* of the judiciary" and "avoid impropriety and the appearance of impropriety."  The Board concluded that respondent's conduct did not implicate public confidence in the judiciary because it was not "in furtherance" or "in [] performance of" her judicial duties, but rather related to an issue insular to the family court judiciary and of no real interest or consequence to the public.  We disagree.

In this instance, it is not the underlying subject matter of the misconduct that is determinative of whether public confidence is impacted, but the nature of the misconduct itself.  Here, respondent was found to be serially less than candid with disciplinary authorities—once while under oath.  This misconduct strikes at the very heart of respondent's expectations of litigants and attorneys who appear before her—that they will

---

of JDC; SJDC seems to suggest that demanding JDC's recusal was an extension of that plot.  Respondent maintains she was simply communicating with an arm of her employer and that neither the Court, the Commission, nor JDC would be particularly pressured by the "prestige" of her position as a family court judge—with whom these entities regularly (and almost exclusively) deal and oversee.  The Board found—and we agree—that respondent was merely expressing concern about JDC's impartiality and therefore committed no Rule 1.3 violation.

25

be truthful and candid in adherence to their oath and in deference to her authority over the proceedings.  The Court has previously acknowledged that

> "[t]he public at large is entitled to honesty and integrity in judicial officials elected to mete out justice, apportion equity, and adjudicate disputes. We cannot ask for more, but we should certainly not expect less, particularly when it is the robed arbiter who, when administering the oath to witnesses, cautions them to tell the truth, the whole truth, and nothing but the truth."

*In re Callaghan*, 238 W. Va. 495, 512, 796 S.E.2d 604, 621 (2017) (quoting *In re Lowery*, 999 S.W.2d 639, 663 (Tex. Rev. Trib. 1998)).

It is of no moment then that the general public may be uninterested in or unaware of the minutiae of the Stotler or Moats letters or respondent's involvement with them; it is her lack of candor—while under oath and to those charged with policing the judiciary—that unquestionably erodes public confidence in the judiciary at large.  The Court has observed that the public has a rightful expectation of scrupulous honesty from its judiciary—in both fact and appearance:

> Citizens judge the law by what they see and hear in courts, and by the character and manners of judges and lawyers.  "The law should provide an exemplar of correct behavior. When the judge presides in court, he personifies the law . . . ."  Hence, a judge must be more than independent and honest; equally important, a judge must be perceived by the public to be independent and honest. Not only must justice be done, it also must appear to be done.

*In re Watkins*, 233 W. Va. 170, 182, 757 S.E.2d 594, 606 (2013) (footnote omitted) (quoting, in part, *In re Ross*, 428 A.2d 858, 866 (Me. 1981)).  Were the Court to find

26

respondent's conduct immaterial to the public's confidence in the judiciary, we would render the requirement that judges demonstrate "integrity" a "meaningless ethical talisman." *Callaghan*, 238 W. Va. at 512, 796 S.E.2d at 621.

The Court therefore finds by clear and convincing evidence that, in addition to the three violations found by the Board, respondent committed a violation of Rule 1.2 as alleged in Charge Two of the statement of charges.

## C.   DISCIPLINE

Mindful that "[t]he purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice[,]" we turn now to the Board's recommended discipline. Syl., *In re Gorby*, 176 W. Va. 16, 339 S.E.2d 702 (1985).

> Under Rule 4.12 of the *Rules of Judicial Disciplinary Procedure* [1998] the Judicial Hearing Board may recommend, or this Court may impose, one or more of the following sanctions for each violation by a justice, judge, or magistrate of the *Code of Judicial Conduct*: (1) admonishment; (2) reprimand; (3) censure; (4) suspension without pay for up to one year; (5) a fine of up to $5,000; or (6) involuntary retirement in limited circumstances. Additionally, this Court can assess the cost of the disciplinary proceedings against a justice, judge, or magistrate.

*Watkins*, 233 W. Va. at 170, 757 S.E.2d at 594, syl. pt. 6; *see also* W. Va. R. Jud. Disciplinary P. 4.12.

27

As previously indicated, the Board recommended that respondent be reprimanded and required to pay the costs of these proceedings. Rule 4.12 explains that "[a] reprimand constitutes a severe reproof to a judge who has engaged in conduct which violated the Code of Judicial Conduct." SJDC objects, claiming that "anything short of a term ending suspension" would undermine "the entire judicial discipline process by diminishing the obligation of judges to be truthful in the face of an investigation." SJDC argues that respondent and Stotler's conduct was motivated by a concerted effort to protect their "perceived powers as family courts judges" and that because of her conduct, respondent is "unfit to sit in judgment of others."[21] Respondent offers little to no argument as to the appropriate discipline, arguing instead that she committed no violations in the first instance.

The fashioning of judicial discipline "must be premised upon the unique facts of each individual case." *Callaghan*, 238 W. Va. at 523, 796 S.E.2d at 632. Moreover, "'[a]ny sanction must be designed to announce publicly our recognition that there has been

---

[21] In support of its request for suspension, SJDC's brief is replete with inflammatory language about the accusations laid out against JDC in the Stotler letter and respondent's "role in [its] creation[.]" Far afield of the charged violations in this case, SJDC belabors the "reckless" allegations contained therein and chastises respondent and Stotler for their "[p]ublic shaming" and "bully[ing] and berat[ing] two life-long public servants[.]" However, we are careful to note that respondent was not charged with any judicial code violations relative to the content of the Stotler letter—nor was Stotler himself ultimately disciplined for any such content. The violations to which Stotler and JDC jointly stipulated pertained solely to his transmission of the letter during the pendency of the Goldston matter. Similarly, respondent's charges pertain nearly exclusively to misrepresentations to disciplinary authorities about her proofreading efforts.

misconduct; it must be sufficient to deter the individual being sanctioned from again engaging in such conduct and to prevent others from engaging in similar misconduct in the future.'" *Id.* at 528, 796 S.E.2d at 637 (quoting *Comm. on Legal Ethics of the W. Va. State Bar v. Karl*, 192 W. Va. 23, 34, 449 S.E.2d 277, 288 (1994)). With specific regard to suspension of a judicial officer, we have held that the following non-inclusive factors provide guidance:

> (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist.

Syl. Pt. 3, in part, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

As to the first factor, respondent's misconduct quite plainly bears on the public's perception of the administration of justice, as explained above. *Id*. As to whether the underlying circumstances are personal or relate to respondent's public persona, it is this factor where the Board's distinction between the misconduct and the performance of respondent's judicial duties gains some traction. *Id*. While not "entirely personal" in nature, the underlying circumstances are somewhat peripheral to respondent's public-facing judicial role and attendant duties. *Id*. Moreover, as to the third factor, certainly candor and cooperation with disciplinary authorities are imperative for judicial officers for the reasons identified above. However—in the context of the appropriateness of a

suspension—we do not find the underlying circumstances on the whole egregious enough to demonstrate a "callous disregard" for our system of justice that is correlative to "violence," as referenced in that factor. *Id*.

Finally, as to aggravation and mitigation, SJDC takes no issue with the mitigating factors found by the Board, including respondent's lack of prior disciplinary record and the character evidence offered on her behalf. Rather, SJDC suggests that the Board overlooked several aggravating factors including absence of remorse, multiple current violations, and belabors respondent's continued lack of candor in defense to the charges. However, the Board expressly noted "the violations themselves" as aggravating factors and SJDC offers little as to respondent's remorse either way, focusing instead on respondent's defense that she was not untruthful in her statements.[22]

While recognizing that judicial disciplinary cases are "rarely apples to apples," we find that SJDC fails to provide comparative support for its demand for suspension. *Williams*, 248 W. Va. at 129, 887 S.E.2d at 254. The disciplinary proceedings cited by SJDC in support of its request, in large part, involve lawyers who were not candid

---

[22] While the Court has previously found refusal to admit wrongdoing aggravating, we have considered and rejected respondent's insistence that she did not knowingly misrepresent her involvement with the Stotler letter in finding that she committed the violations at issue. Therefore, her defense to the charges—largely an issue of credibility rather than undisputed evidence—is somewhat part and parcel of the violations themselves, and we decline to use it doubly against her as aggravation under the facts and circumstances of this case.

with tribunals along with a number of other serious violations directly involving their representation of clients.

Our own review of judicial suspensions involving Rule 2.16(A) violations reveal that any Rule 2.16(A) violation proven in those cases was collateral to serious underlying misconduct reflecting overt abuse of judicial office. *See, e.g., Ferguson*, 242 W. Va. at 700, 841 S.E.2d at 896 (suspending magistrate for ninety days upon finding of six violations for "belligerent[] and coercive" behavior with DNR officers investigating fishing violations and attempting to use judicial status for favorable treatment); *Williams*, 248 W. Va. at 129, 887 S.E.2d at 254 (suspending judge for six months upon finding of nine violations for behaving in a "coercive and retaliatory" manner involving traffic stop).

Judicial suspensions not involving Rule 2.16(A) violations have historically involved pervasive and grave misconduct that victimized others. *See, e.g., Callaghan*, 238 W. Va. at 527, 796 S.E.2d at 636 (suspending judge for two years for "directly and methodically target[ing] an opponent with fabricated material and disseminat[ing] it to the electorate[]"); *In re Wilfong*, 234 W. Va. 394, 397, 765 S.E.2d 283, 286 (2014) (suspending judge for two years for extramarital affair with probation officer where she "intertwined the affair with her judicial office" and involved "staff, courthouse employees, the prosecuting attorney's office, and local lawyers in concealing the affair[]"); *In re Toler*, 218 W. Va. 653, 660, 625 S.E.2d 731, 738 (2005) (suspending judge for four years for separate acts of sexual misconduct against four women while performing official duties);

31

*Watkins*, 233 W. Va. at 183, 757 S.E.2d at 607 (suspending judge until end of term for twenty-four charges of, among other violations, using "profanity and threats" against litigants); *In re Riffle*, 210 W. Va. 591, 592, 558 S.E.2d 590, 591 (2001) (suspending magistrate for one year upon conviction of workers' compensation fraud and false reports to Department of Public Safety).

In determining the appropriate sanction for respondent's misconduct, we observe that Stotler himself was reprimanded—a sanction jointly recommended by JDC upon Stotler's stipulation to violations of Rules 1.1, 1.2 and 2.10.[23]   And while the underlying charged conduct of Stotler and respondent differ in character, the inescapable connection between their respective misconduct—as it relates to their involvement with the Stotler letter—makes the suspension and other sanctions requested by SJDC unacceptably disproportionate to the discipline of Stotler.  "[T]his Court is ever mindful that we discipline a judge not for purposes of punishment, vengeance or retribution, but to instruct the public and all judges, ourselves included, of the importance of the function performed by judges in a free society." *Wilfong*, 234 W. Va. at 411, 765 S.E.2d at 300.

---

[23] The Court recognizes that Stotler was charged with additional violations which were not pursued by agreement and that he offered his resignation for medical reasons during the pendency of the underlying proceedings.

In consideration of the nature and underlying circumstances of the violations found herein, we find the Board's recommended sanction of reprimand and payment of costs to be adequate to address respondent's misconduct.

## IV.  CONCLUSION

This Court imposes the following discipline upon respondent:

1.      Respondent is reprimanded for violation of Rules 1.1 and 1.2 and two violations of Rule 2.16(A) of the West Virginia Code of Judicial Conduct.

2.      Respondent is ordered to pay all costs associated these proceedings.

The Clerk of this Court is ordered to issue the mandate forthwith.

Reprimand and other sanctions ordered.